## Zeigler *against* Houtz.

An agreement or deed under which land has been occupied and claimed for upwards of thirty years, may be given in evidence without proof of its execution by the subscribing witnesses.

A levy and sale of a tract of land as being in the possession of a certain person, containing a particular number of acres, will vest the whole tract in the purchaser, although it be found to contain a much greater number of acres.

If a plaintiff in ejectment ask for specific execution of a contract for the sale of land, he cannot recover, if it appear that he has been guilty of laches and such conduct as was calculated to induce the other party to suppose that he had abandoned his contract: and especially if he had permitted so long a time to elapse as that a legal title would have been barred by the Act of Limitations.

ERROR to the Common Pleas of *Northumberland* county.

This was an action of ejectment by Isaac Zeigler against Christian Houtz. It was argued in this court by

*Pleasants,* for the plaintiff in error.
*Greenough,* for defendant in error.

The whole case is very fully stated in the opinion of the Court delivered by

HUSTON, J.—As this cause and the rights of the parties depended on a complicated state of facts, running through a long period of time, I shall endeavour to state those facts in the order in which they occurred, instead of giving the evidence in the order in which it was given to the jury.

12th of September 1793, application for a warrant to John Brady, endorsed John *Barron* to pay.

18th of September 1793, warrant to John Brady, 400 acres,

I. — 2 U *

adjoining lands surveyed for Samuel Wetherell, and to begin at his white-oak corner, near a heap of stones, and to include the first crossing of Shamokin creek, from Cherry's tavern to Sunbury.

24th of October 1794, surveyed 439¾ acres by William Gray, district surveyor.

10th of June 1799, deed *John Barron* to William Barker, for survey warrants and tracts, one of which is " John Brady."

28th of March 1800, William Barker to John Myer.

4th of December 1800, deed John Myer to John Cherry, consideration £50, for all that tract of land adjoining Luke Fitler, Samuel Wetherell, Samuel Clark, Ludwig Goss, William Baker, William P. Brady and Thomas Hamilton, containing 439 acres, surveyed to John Brady, deceased, and reciting the titles above given. The names of the adjoining surveys called for include those bounding the survey on every line.

9th of September 1808, deed John Cherry to Benjamin Campbell, for the whole tract acknowledged 19th of September 1808; not recorded until 26th January 1831. Both titles were derived in different modes under Benjamin Campbell. It was shown that in 1806 John Cherry and Benjamin Campbell had entered into articles of agreement to build a saw-mill on the tract John Brady, in partnership, each covenanting to give to the other an offer of his share if either wished to sell. The saw-mill was built, and Campbell in possession when Cherry made the above deed; *and by the concurrent testimony of every witness, Campbell, or the persons claiming under him by deed, or their tenants, had been residing on the land up to and at the trial.* The plaintiff claimed under an alleged *parol* agreement between Campbell and Cherry, under which Cherry made mill-stones, on the east end of the tract. *The plaintiff alleged that Campbell, when he patented the whole tract, was to re-convey this part to Cherry.* Defendant denied any such agreement, but agreed he made mill-stones by permission, or by parol contract to last during Cherry's life. There was never any dwelling-house on this disputed end during Cherry's life, nor till since this dispute arose; but there was a small cabin without chimney, or floor, (except the earth,) or window, used as a shelter in a storm while making mill-stones.

One of the tracts adjoining John Brady was surveyed in the name of Samuel Clarke. It was conceded on both sides that this last tract, or two-thirds of it, had belonged to Francis Johnson, who by articles of agreement had contracted *to sell* to John Cherry and his brother Abraham, and that Abraham had sold his interest in the contract to John.

28th of April 1813, John Cherry entered into articles of agreement with George Dick, by which he agreed to convey to said Dick " two certain parcels or pieces of land, situate and lying in the township of Shamokin, and county aforesaid, described as follows: the one parcel being a part of a tract of land which was

conveyed from Francis Johnson to Abraham Cherry, and the said Abraham Cherry oversigned his article with the said Francis unto John Cherry, party hereto, a part of which has since been sold to Benjamin Campbell, and the remaining part or parcel of land, lying on the west end of the aforementioned tract or piece of land, is the part or parcel intended, being a remainder of one hundred acres; the other piece or parcel of land is situate and lying in Shamokin township aforesaid, being part of another tract of land, a part of which was conveyed to Benjamin Campbell, (as may be seen by an article of agreement bearing date the 19th of September 1808,) *the remaining part, or east end* of the piece intended being fifty acres;" for which George Dick agrees to pay John Cherry $800, as follows: $100 down, the year following $200, upon receiving which payment the said John Cherry is to give a good and sufficient warranty deed for said land, and the remaining price, being $500, *is* to be paid annually $100 per year. Signed and sealed by John Cherry.

Witness, JOHN WOLVERTON.

Some time in the autumn of 1813, John Cherry went to the west to see the country, and died there. On the 26th of August 1814, on a petition presented under the Act of 31st March 1792, proof of the execution of these articles was received in open court, and the proof being made by John Wolverton, the subscribing witness, it was adjudged sufficient, and directed to be recorded; and it was recorded the same day; and on a petition by the administrators of John Cherry, the court direct and empower them to make a deed to George Dick.

On 17th of April 1815, John Wolverton and Charles Saxton, the administrators of John Cherry, executed a deed to George Dick, for the parcel first mentioned in the preceding articles of agreement, being 100 acres. This showed an acknowledgment of the receipt of the whole $800, and was read for this purpose. This only put the defendant to the trouble of showing four bonds given by George Dick to Wolverton and Saxton, administrators of Cherry, each for $100, all dated 17th of April 1815, on which was written, in the hand-writing of the scrivener who drew the bonds and the deed for the 100 acres, " agreed the money due on the within bonds shall not be demanded until we make George Dick a good and sufficient title to the 50 acres contained in the article, and not included in the deed this day made said Dick, shall be made to the said Dick." The present suit is for the recovery of this 50 acres.

January 7th 1813, J. P. Degruchy obtained a judgment against Benjamin Campbell for $313.30, and such proceedings were had on that and another judgment against Campbell, that a sale was made of Campbell's land. The levy was as follows: " Levied on a certain tract of land in Shamokin township, containing 350

[Zeigler v. Houtz.]

acres, more or less, adjoining lands of John Cherry, Francis Johnson, Jacob Goss, and others, on which a saw-mill is erected." At April 1813 the levy was returned: after sundry proceedings, the land was sold at April 1818. There being in the hands of the sheriff a *pluries venditioni exponas* on the above judgment, and another *venditioni exponas* on another judgment, the land was sold to George Dunkleberger for $330.

28th of April 1818, sheriff's deed—Walter Brady, sheriff, to George Dunkleberger—acknowledged in open court 1st of May 1818. The description in the deed follows the levy. George Dunkleberger immediately took possession.

On 9th of June 1818, articles of agreement were entered into, by which George Dick agreed to sell to Dunkleberger. They stated, " that George Dick, for the consideration hereafter mentioned, doth covenant, promise, grant, and agree to and with the said George Dunkleberger, his heirs and assigns, ·that he, the said George Dick, his executor, &c., shall or will, on the 1st of April next, by such deed or deeds, &c., as he or they, or his or their counsel shall advise, well and sufficiently grant, convey, and assure, to George Dunkleberger, and his heirs and assigns, all those certain pieces or tracts of land situate in Shamokin township, Northumberland county, the one piece, containing 100 acres, adjoining lands of Benjamin Campbell and others" (it was conceded on all sides this last was part of the Samuel Clark survey), " *the other piece containing 50 acres, and adjoining Benjamin Campbell and Frederick Leversperger.*" In consideration whereof, George Dunkleberger agreed to pay $860; to pay $360 on making and delivery of the deed, and *$500 in yearly sums of $100*; to give notes with security for these instalments. A receipt for $66 was endorsed on this on the day it was dated. Nothing was shown in this cause to have been done further on this article, except the sale, hereafter mentioned, to Mr Bellas.

On 28th of April 1828, deed, George Dunkleberger and wife to Henry Myers and Samuel Myers, for the land he had purchased at sheriff's sale, as the property of Benjamin Campbell; consideration $550; deed acknowledged 23d of May 1828, and again, more formally, 23d of March 1837, before a different justice.

On 28th of July 1828, by articles, Henry Myers agreed to convey to Christian Houtz the same 350 acres, more or less. Henry Myers died.

On 14th of September 1836, on a petition, the court received proof of the execution of these articles. *Adjudged* it sufficient, and ordered it to be recorded, and a deed to be made; and on 16th of October 1836, Francis A. Myers, administrator of Henry Myers, conveyed by deed, reciting the courses and distances, the whole tract surveyed in name of Brady, in pursuance of the articles of agreement. The deed was acknowledged 21st of October 1836.

[Zeigler v. Houtz.]

In the meantime, after the sale by Dunkleberger to Myers, and the articles, Myers to Houtz, to wit: on —— December 1829, George Dick conveyed to George Bower, the two pieces of land, one a part of Samuel Clark tract containing 100 acres 66 perches; the other adjoining Leversperger, 50 acres.

24th of December 1829, proved and recorded.

28th of December 1829, conveyed by Bower to H. Bellas, and recorded.

1st of March 1838, conveyed by Bellas to Isaac Zeigler, *one-fifth of the* 50 acres; but in this deed he calls it 75 acres, part of John Brady. It was afterwards shown that Zeigler was a trustee for Bellas; and was to reconvey, if he gained the land; and Bellas to indemnify him as to costs.

On the 15th of April 1831, Samuel Myers conveyed his half of the tract bought of Dunkleberger, to Charles G. Donnel; consideration $1000. It is here called 439 acres, surveyed for John Brady.

3d of September 1836. Deed: Charles G. Donnel and wife to Christian Houtz; the one-half purchased from Samuel Myers, described as in last deed. Consideration $792.

The defendants then showed: 3d of September 1836. Deed: Christian Houtz to Charles G. Donnel.

3d of September 1836. Deed; Christian Houtz to Henry Masser. Consideration $112.

30th of September 1836. Deed: same to Robert M'Carty. Consideration $4961.89.

4th of March 1837. Deed: same to Lewis Dewart. Consideration $1775.

11th of May 1837. Deed: same to C. G. Donnel. Consideration $2433.33.

11th of May 1837. Deed: same to Lewis Dewart. Consideration $2433.33.

22d of March 1838. Deed: same to Henry Snyder. Consideration $6000.

All the above deeds were for parts of the John Brady tract.

This suit was brought to April Term 1838. The writ was served on Houtz 20th of March 1838, after the date of all the above deeds, except the last one.

Before proceeding further I am disposed to notice a practice once common in this district, and often reprimanded in this court; I mean the practice of taking bills of exception to all evidence offered. It is absurd in every point of view; it has the appearance of being a want of respect to the court; it is, in fact, more like a want of confidence of the counsel in themselves. If we did not know the learning and ability of the counsel concerned, we might suspect them of not being able to discriminate between what was and what was not legal testimony. It was in this case

pretty much the course of each party; of some twenty bills of exceptions to evidence, only one or two deserve any notice.

The land in dispute lay in the place where Shamokin creek runs through a gap in what is there called the Big Mountain; and on the southerly side of that mountain. The John Brady tract extended across the creek in nearly an east and west direction; and its length about twice its breadth north and south. It was bounded on the north by lands of Ludwig Goss. He died, and his lands became the property of Jacob Goss and Martin Goss. The east end of the John Brady tract was bounded by a survey in the name of Luke Fitler. The south boundary, which was not a straight line, adjoined older surveys in the names of Samuel Wetherell and Samuel Clark. I have given the boundaries easterly of Shamokin creek, because this suit respected land there.

A difficulty arose at every step. John Myers had sold the whole tract, in the name of Brady, to John Cherry; after Cherry and Campbell had built the saw-mill, Cherry conveyed the whole tract to Campbell; but the plaintiff contended that some parol agreement was made at the time of this deed, in 1809, by which Cherry was to have 50 acres off the east end of this tract, to be reconveyed by Campbell, when he had obtained a patent for the whole tract. This agreement was denied by defendant, who alleged there was only a parol agreement that Cherry might make millstones on the part east of the creek, during his life, as he had been doing before he sold to Campbell; and as he continued to do until he went to Ohio in 1813, and died. Cherry had something like a house of small logs, without floor, door, window, or chimney, on this part, but no one ever resided in it—a mere shelter from a storm while working at millstones.

The assessment of taxes was shown. Campbell always returned his saw-mill tract as 400 acres.

George Dick was taxed for only 100 acres; or one year 108 acres. He was never taxed for 50 acres, beside the 100.

On 2d of September 1806, articles of agreement were entered into between John Cherry, and Abraham Cherry, and Benjamin Campbell; it related to building the saw-mill on the Brady tract; and each party, that is, the two Cherrys and Campbell, were to have one-half; and, in case of sale, to offer first to the other party. After several witnesses had been examined, and the death of the parties and of one of the witnesses had been proved, and some evidence as to the other witness having removed, and not been heard of for twenty years, and evidence was receiving of the handwriting, a witness swore that he had seen the absent witness a year ago in Lycoming county. The agreement was objected to, received, and exception taken. In a case where the paper was of more recent date, or where there had not been a continued possession in accordance with it, there would be error; but it had been indisputably proved, and no contradiction, that the saw-mill

[Zeigler v. Houtz.]

had been built immediately, and occupied by the partners until sold to Campbell, and by him and those claiming under or through him, ever since, being a period of more than 30 years; it might have been read without proof.

We do not think it necessary to notice any other bills of exceptions. There are cases in which it is not amiss to receive almost any testimony, though bearing remotely on the question; and here every thing was received. The plaintiff called at least a dozen witnesses to prove that Cherry, after his sale of the whole tract to Campbell, continued to make millstones on the east end of the tract until his death in 1813; and that a millstone or two were finished, immediately after his death, by his nephews; and to prove that he spoke of his right there; one witness distinctly spoke of Campbell's acknowledgment of this right, and that Campbell said he was to make a deed to Dick. It was doubtful, however, if the deed related to part of the Brady tract. On the other hand, one or two witnesses proved that Cherry himself had said, he had from Campbell permission to make millstones as long as he (Cherry) lived.

I have stated that John Cherry lived on the east of the John Brady tract, called the Fitler tract; he had a house and stillhouse on it, and a field of from 15 to 20 acres cleared and cultivated; rye was growing on it when he died. Much testimony was given to prove that this field extended into the Brady tract; and thus Cherry had possession of the east part of it. All this went for nothing on its being clearly proved by surveyors, that only a small corner of the field extended on the Brady tract— *only one or two perches of land.*

I come now to the errors assigned to the charge of the court; the first of which is, that the court said that the deed from Cherry to Campbell, conveyed all the land in the John Brady survey. Nothing was said before us on this point; the deed was not all read to us; the abstract of it on our paper book states it conveyed the land, surveyed for John Brady; nay more, the plaintiff's case seemed to rest on this: that, although all was conveyed to Campbell, yet there was some understanding that he was to reconvey a part, after obtaining a patent, to Cherry.

The second error assigned, was in submitting to the jury whether the interest, conceded to have been promised by Campbell to Cherry, was by the agreement to be a right in fee, to part of the Brady tract, or was only a permission of Campbell to Cherry to make millstones during his life. It was *not* submitted without evidence, for at least one witness swore positively that Cherry told him so; and it would seem the jury believed this testimony. If it was found by the jury to be only a permission for life, clearly the court was right in saying the plaintiff could not recover.

Every thing was disputed—whether the levy and sale of 350

acres, more or less, with a saw-mill thereon, adjoining John Cherry, Francis Johnson, Jacob Goss, and others, and the corresponding deed by the sheriff, conveyed the whole John Brady tract, was much contested. That tract adjoined F. Johnson on the south, and J. Goss on the north. John Cherry, as plaintiff alleged, claimed the east end of the tract, and this was the John Cherry called for. The defendant had proved that John Cherry, in his lifetime, had his house and still-house, and cleared land on the Luke Fitler tract, which adjoined Brady on the east, and that this answered the call. It had also been proved that Cherry had claimed the Fitler tract as vacant land; all this evidence was submitted to the jury. In 5 *Serg. & Rawle* 260, it is said, " the limitations in a deed are always matter of law; what lands are described, is often a matter of fact. The description of the property and its extent, often is a mixed question of law and fact." We have not many cases immediately on this subject: the judge alludes to the cases arising on the sales of Colonel Francis's estate. He owned a body of lands beginning four miles below Milton, on the west branch of the Susquehanna, and extending above where that town stands. The body was divided in his lifetime by lines, intended to leave about 240 acres in each lot; but from carelessness, or some other cause, some had less than 200 acres, and some 250, and even more; each lot was occupied by some person. While property was of low price, these were levied on in the hands of his executors, and sold as 200 acres each, and designating each lot by the name of the tenant. In process of time his heirs brought ejectments to confine the purchasers to 200 acres. The lands had been sold for from thirty to forty shillings an acre, and were, at the time of suits brought, worth as many dollars. The first cause was tried in the Common Pleas; then they were removed to the Supreme Court, and tried before the different judges of the Supreme Court, as they in succession held Courts of Nisi Prius, or Circuit Courts; and the law was considered then and since settled, that when a tract of land was levied on, as in the occupation of a particular person, the purchaser got all that was occupied by that person, and must bear the loss, if less than the specified quantity, and have the gain, if more. Our Acts of Assembly forbid any quantity less than a whole tract to be levied on or sold. The debtor could not complain; for if the description was not right, the sheriff before return of levy, or the court after the return, would make it correct. In the above cited case, 5 *Serg. & Rawle* 263, the present Chief Justice says, the articles of agreement (between defendant and purchaser at sheriff's sale) would have effect, only in case the levy and sheriff's sale under Walker's judgment, did not include the land in dispute; for if it were included, it passed by the sheriff's deed, and no agreement of the heirs and creditors of defendant in the execution with the purchaser, could add to the validity of the title. This

[Zeigler v. Houtz.]

was recognizing the above doctrine fully. The levy in that case was on 320 acres in possession of John Blair. The land adjoined Loyalsock creek, and the purchaser eventually held half the creek and some ground surrounded by water, or covered when it was high; making in all near 400 acres.

There was much testimony and reference to drafts, to determine whether the 50 acres mentioned in the agreement between Cherry and Dick, and Dick and Dunkleberger, ever were intended, or from the articles of agreement, could be applied to any part of the Brady tract; whether it did not apply to the other claims of John Cherry on the Fitler and Wetherell surveys. All these matters were fairly left to the jury on the written contracts and parol evidence: not to have so left it would have been error. The next two errors do not relate to any matter of law, and only relate to the court leaving to the jury what could not legally be withdrawn from them. The other errors are first, in telling the jury that if the plaintiff, and those under whom he claimed, had laid by from 1814, when the article between Dick and Cherry was proved and recorded, till April Term 1838, the land being all that time occupied, claimed, and three times sold and paid for, the plaintiff was barred by the Act of Limitations; and clearly he was so. Instead of remarks of my own on this subject, I refer to the opinion of the present Chief Justice in *Pipher* v. *Lodge*, (16 *Serg. & Rawle* 224–5), and the opinion of Justice Tod in that case, page 233, to the end of the case; and I do so because there was allegation of trust in that case, and because I know no more lucid and forcible exposition of the true spirit of that Act, and the duty of courts in relation to it. The residue of the charge relates to a point nearly allied to this, viz: the effect of delay in bringing forward the plaintiff's claim. John Cherry made this agreement with George Dick in 1813; on Cherry's death the articles were proved and recorded in 1814. The administrators convey the 100 acres in 1815; they put a receipt for the whole consideration at the foot of the deed; but on the facts in evidence, this proves nothing. Judge Yeates said long ago, that a receipt of the consideration money in the body, or at the foot of a deed, was hardly *primâ facie* evidence that it had been paid. I know not how the practice crept in, but the receipt is found regularly; though at the same time bonds are given for a large part of the purchase money. In this case bonds were given for $400, one-half the purchase money, and endorsed on them not to be paid until a title could be made for the 50 acres. Benjamin Campbell was alive; no application to him to convey; no occupation of any part of the Brady tract; Dick must have known where his 50 acres were to lie; the administrators of Cherry must have known; nothing more is heard. In 1818 Campbell's property is sold, and Dunkleberger purchases; his deed is given 1st of May. On the 9th of June following, he contracts with Dick for the two

pieces of land Dick had bought of Cherry; the 50 acres were to adjoin Benjamin Campbell and George Leversperger; but Campbell's right in the Brady tract, was now Dunkleberger's: it would seem this could not be intended. Campbell however had other land, a part of the Clark survey, and between that and Leversperger, was land which some witnesses say Cherry once claimed; (this I have said was left to the jury.) In April 1828, Dunkleberger sells to Samuel and Henry Myers; Myers finds some iron-ore. In July 1828, Henry Myers sells his half to C. Houtz. In 1829, in December, Mr Bellas employs George Bower to hunt for George Dick; coal was then talked of. In 1838 Mr Bellas conveys one-fifth of the 50 acres to Zeigler; who, if he gains, is to reconvey. In 1831 Samuel Myers sells to Damich, and then follow all the deeds before stated. It had been discovered to be the centre of the Shamokin coal region; towns laid out; houses built; a rail-road made at an expense of half a million, and land selling from $30 to $100 per acre, when this suit is brought.

This case has been argued as if the right of the plaintiff depended on articles of agreement deducing title to him. In fact his whole claim is founded on an alleged parol agreement. John Cherry sold the whole John Brady tract to Benjamin Campbell, and plaintiff's allegation is, that Campbell was to re-convey 50 acres of the east end to Cherry; this was by parol. Cherry's article with Dick, supposing it to relate to this 50 acres, put him in the place of Cherry, and gave him a right to call on Campbell for this conveyance, or to sue Cherry, if he did not procure Campbell to convey. Dick's conveyance to Bellas, gives him whatever right Dick had to call for this conveyance; and *this ejectment brought in 1838, is a call on a court and jury to carry into effect a parol agreement made in 1808, not against Benjamin Campbell* or his heirs, but against those who bought from Houtz, who bought from Myers, who bought from Dunkleberger, who bought Campbell's title at sheriff's sale in April 1818. Now in addition to all this, it is clear George Dick never paid one cent to Cherry or his representatives, for this 50 acres. It is also clear that in April 1815, when the administrators of Cherry made a deed to Dick for the 100 acres mentioned in the same articles of agreement, it was well understood by them and Dick, that they could make no title to him for this 50 acres; and a memorandum made that they were not to call on him for the price until they could make a title: and after this Dick moves away and never asks a deed. It is also clear that at that time the 50 acres was not worth, to sell, $50; and that George Dick could not have got it without paying $400: The rest of the tract with the saw-mill, did not bring $1 per acre. George Dick never stirs or claims a compliance by Campbell with the parol contract, or by Cherry's representatives with written articles, until fourteen years have elapsed, and two sales have been made, and iron-ore and coal are found. Bellas pur-

[Zeigler v. Houtz.]

chases and waits until the wealth of that section is developed, and a rail-road made, and the lands sold at high prices; and in nine years more, asks for a specific performance of a written agreement made in 1813, founded on a parol agreement to the vendor in those articles, made in 1808; a parol agreement under which no land was cleared, no dwelling-house built, no family ever resided. This parol title, sold by articles to a man who never paid a cent, never took possession, never returned it for taxation.

In a case like this, before we can begin seriously to inquire whether the plaintiff can recover, we must forget all we have learned, or overrule all that has been decided: we must forget all the cases in which it is said he who asks for specific performance, must not have been guilty of laches, of trifling; must have been ready and willing to comply on his part; not have suffered the other party to suppose the contract abandoned, and so spend money in improvements; not to have suffered purchasers to buy and pay, and build; not to have laid by till something has increased the value to double, or four-fold; or, as in this case, a hundred-fold; must not lay by an unreasonable time; much less, as in this case, a length of time, during which the Statute of Limitations would bar a legal estate.

But it was said the articles of agreement between John Cherry and George Dick, were procured to be recorded, on a petition in the Common Pleas of Northumberland county, in August 1814; and this was notice to all the world. These articles thus recorded, could only be notice of what was in them, or at most, of something to which they referred, relating to the land, or the title to the land affected by them. What do they contain? After designating the 100 acres bought of F. Johnson, (not in dispute in this cause) they proceed: "The other piece or parcel of land, is situate, and lying in Shamokin township aforesaid; it being part of another tract of land, a part of which was conveyed to Benjamin Campbell; (as may be seen by an article of agreement, bearing date the 19th of September 1808;) the remaining part on the east end, is the piece intended, being 50 acres." Now, without saying what this does describe, it cannot be tortured, without mutilation, to designate the land in question. John Cherry had conveyed in fee, the whole of the John Brady tract to Benjamin Campbell, on the 9th of September 1808; he would not be likely to convey a part of the same tract by articles of agreement, on the 19th of the same month. At all events, this recorded article would be notice, if of any thing, that the 50 acres were not part of the John Brady tract, conveyed by deed to Campbell, on the 9th of September 1808, but of some other tract, about which there was an article of agreement on the 19th of September 1808. The parol evidence does not remove the uncertainty; but I recur to the fact, that all these articles of agreement, and the claim of the

[Zeigler v. Houtz.]

plaintiff, depend on the alleged parol contract between Benjamin Campbell and old John Cherry, made, if ever, in 1809, and uncertain as to its terms, both as to the land agreed to be conveyed, and uncertain whether for life or in fee; and that agreement never complied with by Campbell, nor insisted on during his life, or since, until this suit was brought: to carry it into effect now, would overturn every principle settled on this subject.

, Judgment affirmed.